GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

KEVIN M. RAPP (Ariz. Bar No. 014249, kevin.rapp@usdoj.gov)
MARGARET PERLMETER (Ariz. Bar No. 024805, margaret.perlmeter@usdoj.gov)
PETER S. KOZINETS (Ariz. Bar No. 019856, peter.kozinets@usdoj.gov)
ANDREW C. STONE (Ariz. Bar No. 026543, andrew.stone@usdoj.gov)
Assistant U.S. Attorneys
40 N. Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500

DAN G. BOYLE (N.Y. Bar No. 5216825, daniel.boyle2@usdoj.gov)
Special Assistant U.S. Attorney
312 N. Spring Street, Suite 1400
Los Angeles, CA 90012
Telephone (213) 894-2426

KENNETH POLITE
Assistant Attorney General
Criminal Division, U.S. Department of Justice

REGINALD E. JONES (D.C. Bar No. 1620183, reginald.jones4@usdoj.gov)
Senior Trial Attorney
U.S. Department of Justice, Criminal Division
1400 New York  Ave N.W., Suite 1200
Washington, D.C. 20005
Telephone (202) 616-2807
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>  v.<br><br>Michael Lacey, et al.,<br><br>     Defendants. | No. CR-18-422-PHX-DJH<br><br>**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br>**(Doc. 1355)**<br><br>[*Redacted For Public Filing*]<br><br>Oral Argument:<br>December 3, 2021, 9:00 a.m. |

1

2

# I. **TABLE OF CONTENTS**

Page

A.  Table of Contents…….……………………………………………………i

B.  Table of Authorities……………………………………………………….iii

C.  Preliminary Statement……………………………………………………...1

D.  Background……………………………………………………………...…3

    I.  The Grand Jury Indicted Defendants for Facilitating Prostitution, Money Laundering and Conspiracy…………………………………………..3

    II.  The United States Worked Diligently for Years to Bring this Case to Trial………………………………………………………………………5

    III.  The Court Ruled the United States Could Refer to Child Sex Trafficking at Trial ………………………………………………………..……………6

    IV.  The United States Did Not Use Its Opening Statement to Provoke a Mistrial………………...…….………………….….…..……………6

    V.  The United States' First Witness Provided a Devastating Overview of Defendants' Website………………………………………………...7

    VI.  There Was No Intentional Misconduct……..……………………….9

        A.  Jessika Svendgard………………………………………….10

        B.  Nacole Svendgard…………………………………………12

        C.  Dr. Sharon Cooper…………………………………………13

    VII.  The Mistrial Ruling Was Largely Based on Concerns About "Cumulative" Child Sex Trafficking References……………………………………14

E.  Argument………………………………………………………………15

    I.  Retrial is Not Barred By the Double Jeopardy Clause…………………15

        A.  Defendants Must Prove that the United States Deliberately Sabotaged the Trial—an Extraordinary Standard that Is Almost Never Met……….....………………………………………..…………15

        B.  Defendants Have Failed to Meet *Kennedy's* Exacting Standard……16

        C.  Defendants Have Failed to Make a Colorable Double Jeopardy Claim…………………………………………………………21

    II.  The Extreme Sanction of Dismissal is Not Appropriate Under Due Process or the Court's Supervisory Powers…………………………………...21

        A.  Defendants Cannot Obtain Relief Under the Due Process Clause….21

B.   The Court Should Not Grant the Extreme Remedy of Dismissal Under Its Supervisory Power……………………………………………...23

F.   Conclusion……………………………………………………………......33

## II. <u>TABLE OF AUTHORITIES</u>

<u>CASES</u> <u>PAGE(S)</u>

*Arizona v. Washington,*
    434 U.S. 497 (1978) ................................................................................ 21

*Erotic Service Provider Legal Ed. And Research Project v. Gascon,*
    880 F.3d 450 (9th Cir. 2018) ................................................................ 19

*McNabb v. United States,*
    318 U.S. 332 (1943) ....................................................................... 3, 23-24

*Pinkerton v. United States,*
    328 U.S. 640 (1946) ................................................................................. 5

*Pittsburgh Press Co.  v. Human Relations Comm'n,*
    413 U.S. 376 (1973) ............................................................................... 19

*Richardson v. United States,*
    468 U.S. 317 (1984) ............................................................................... 21

*Oregon v. Kennedy,*
    456 U.S. 667 (1982) ..................................................................... 1, 15, 20

*Tibbs v. Florida,*
    457 U.S. 31 (1982) ................................................................................. 21

*Tyler v. Barnes,*
    2015 WL 6537149 (E.D. Cal. Oct. 28, 2015) ................................... 16

*United States v. Aguilar,*
    831 F. Supp. 2d 1187-98 (C.D. Cal. 2011) ....................................... 24

*United States v. Black,*
    733 F.3d 294 (9th Cir. 2013) ............................................................... 22

*United States v. Bundy,*
    968 F.3d 1019 (9th Cir. 2020) ............................................... 23, 25-26

*United States v. Chapman,*
    524 F.3d 1073 (9th Cir. 2008) ............................................................ 25

*United States v. Curtis,*
    683 F.2d 769 (3rd Cir. 1982) .............................................................. 20

*United States v. Dinitz,*
    424 U.S. 600 (1976) ............................................................................... 15

*United States v. Fowlkes*,
   804 F.3d 954 (9th Cir. 2015) ........................................................ 16

*United States v. Isgro*,
   974 F.2d 1091 (9th Cir. 1992) ..................................................... 23

*United States v. Jorn*,
   400 U.S. 470 (1971) ..................................................................... 15

*United States v. Kearns*,
   5 F.3d 1251 (9th Cir. 1993) ................................................. 2, 22-24

*United States v. Kessler*,
   530 F.2d 1246 (5th Cir. 1976) ..................................................... 21

*United States v. Kojayan*,
   8 F.3d 1315 (9th Cir. 1993) ......................................................... 22

*United States v. Lewis*,
   368 F.3d 1102 (9th Cir. 2004) ..................................................... 15

*United States v. Lopez-Avila*,
   678 F.3d 955 (9th Cir. 2012) ...................................... 1, 15, 20, 24

*United States v. Lun,*
   944 F.2d 642 (9th Cir. 1991) ............................................. *passim*

*United States v. Martin*,
   561 F.2d 135 (8th Cir. 1977) ....................................................... 21

*United States v. McKoy*,
   78 F.3d 446 (9th Cir. 1996) ......................................................... 16

*United States v. Owen*,
   580 F.2d 365 (9th Cir. 1978) ................................................... 3, 23

*United States v. Pedersen*,
   2014 WL 3871197 (D. Or. Aug. 6, 2014) ................................... 31

*United States v. Rogers*,
   751 F.2d 1074 (9th Cir. 1985) ................................................ 22-23

*United States v. Ruehle*,
   583 F.3d 600 (9th Cir. 2009) ....................................................... 28

*United States v. Singleterry*,
   683 F.2d 122 (5th Cir. 1982) ....................................................... 21

*United States v. Sterba*,
   22 F. Supp. 2d 1333 (M.D. Fla. 1998) ........................................ 21

*United States v. Tateo*,
   377 U.S. 463 (1964) ........................................................................ 15

*United States v. Venegas*,
   800 F.2d 868 (9th Cir. 1986) ........................................................ 24

*United States v. Weems*,
   49 F.3d 528 (9th Cir. 1995) .......................................................... 21

*Valle Del Sol Inc. v. Whiting*,
   709 F.3d 808 (9th Cir. 2013) ........................................................ 19

## **RULES**

Fed. R. Evid. Rule 403 ........................................................................ 13

Fed. R. Evid. Rule 702 ........................................................................ 13

Fed. R. Evid. 704 .................................................................................. 18

Preliminary Statement

After expressly finding "I don't see any of these [reasons for the Court's mistrial ruling] as intentional misconduct," Judge Brnovich set a new trial for February 9, 2022—a date this Court has since reaffirmed. (Ex. M. at 5; Docs. 1336 and 1377.)[1] The Court's no-intent finding is fatal to Defendants' motion to dismiss under the Double Jeopardy Clause. In *Oregon v. Kennedy*, 456 U.S. 667, 676 (1982), the Supreme Court held that where, as here, the trial court grants Defendants' motion for a mistrial, only intentional misconduct aimed at sabotaging the trial warrants dismissal on double jeopardy grounds. Defendants bear the heavy burden of proving the prosecutors *intended* to bring about a mistrial: "The only relevant intent is intent to terminate the trial, not intent to prevail at this trial by impermissible means." *United States v. Lopez-Avila*, 678 F.3d 955, 962 (9th Cir. 2012). "In practice," the *Kennedy* standard "is rarely met." *Id*. No reported Ninth Circuit case since *Kennedy* has barred a retrial in these circumstances. For several reasons, Defendants cannot meet their heavy burden of obtaining such extraordinary relief here.

First, the United States never intended to bring about an abrupt end to the trial. The trial team was surprised and deeply disappointed when the Court granted Defendants' mistrial motion on September 14, 2021, after the second full day of testimony in a trial scheduled to last ten weeks. The United States worked for years to get this complex case to trial, and consistently pressed to start at the earliest practicable time. It had only put on four of its more than 70 trial witnesses, and introduced only a handful of its 1,800 trial exhibits, when the mistrial was declared. The witnesses still to come included Backpage CEO Carl Ferrer and Sales and Marketing Director Dan Hyer—two insiders who pleaded guilty and admitted that Backpage facilitated prostitution; former Backpage "moderators"; victims who had been advertised for prostitution on Backpage; representatives of non-governmental organizations, law enforcement and others who repeatedly put Defendants on notice of Backpage's extensive prostitution advertising; and others with knowledge of Defendants' actions. Once trial commenced, Defendants repeatedly sought to terminate the

---

[1] "Ex." refers to the exhibits attached to Defendants' Motion.

proceedings by making multiple mistrial requests—which the United States strenuously opposed. The United States had no intent to end the trial.

Second, the trial judge expressly found that the reasons prompting the mistrial ruling did not involve "intentional misconduct"—and that finding is amply supported by the record. The mistrial declaration was largely based on concerns about the "cumulative effect" of references to child sex trafficking. Pretrial, the Court ordered that sex trafficking and child sex trafficking could be discussed, provided the United States did not "linger on" the details of victims' abuse. Before, during and after the United States' opening statement, the Court reaffirmed that ruling—and the trial judge found that the opening did not violate her orders or "cross the line" when it twice denied Defendants' requests for mistrial on that issue. The United States engaged in detailed colloquies with the Court regarding the scope of its witnesses' testimony, and believed its questions fell within the appropriate bounds of the Court's orders. The Court overruled most of Defendants' objections when the United States' witnesses testified, and there was no intentional misconduct.

Third, Defendants have failed to establish that the United States had any reason to sabotage the trial. The United States' introductory witness gave the jury a detailed overview of how Defendants' website appeared to the public in 2015, and he testified that an undercover ad—modeled on the Backpage Escort ads he showed the jury—generated over 300 responses directed to soliciting sex for money. The United States had noticed over 70 additional witnesses to testify about the true nature of Defendants' business. Moreover, it faced severe prejudice from a mistrial, including the substantial costs and delays of starting anew. *United States v. Lun,* 944 F.2d 642, 646 (9th Cir. 1991). In these circumstances, Defendants do not come anywhere close to *Kennedy*'s exacting standard.

For similar reasons, Defendants' requests under the Due Process Clause and supervisory powers should be denied. To obtain Due Process relief, Defendants have the weighty burden of proving the United States' conduct was "so grossly shocking and outrageous as to violate the universal sense of justice." *United States v. Kearns*, 5 F.3d 1251, 1253 (9th Cir. 1993). If Defendants cannot meet the high bar of *Kennedy*, they

- 2 -

certainly cannot make that showing. Defendants likewise cannot establish "outrageous government conduct" to warrant dismissal under the Court's supervisory powers. The court's exercise of its supervisory powers prevents the courts from "making . . . themselves accomplices in *willful disobedience* of law." *McNabb v. United States*, 318 U.S. 332, 345 (1943) (emphasis added). "[T]hese supervisory powers remain a harsh, ultimate sanction (which) are more often referred to than invoked." *United States v. Owen*, 580 F.2d 365, 367 (9th Cir. 1978). Dismissal "is an extreme sanction which should be infrequently utilized." *Id*. Defendants cannot justify that extreme sanction here.

Defendants also raise several discovery issues that have already been litigated and decided against them. For these and other reasons, the Motion should be denied.

<u>Background</u>

## I. THE GRAND JURY INDICTED DEFENDANTS FOR FACILITATING PROSTITUTION, MONEY LAUNDERING AND CONSPIRACY.

On July 25, 2018, the grand jury returned a Superseding Indictment charging 100 counts of conspiracy, Travel Act and money laundering violations. (Doc. 230, SI.) The SI alleges that from 2004 until April 2018, Defendants owned, controlled or operated www.Backpage.com (Backpage), the internet's leading source of prostitution solicitations. (SI¶¶1-8.) Backpage generated over a half-billion-dollars in revenue from these ads. (SI¶1.)

The SI alleges Defendants knew the vast majority of "adult" ads on their website "were actually ads for prostitution" and pursued several prostitution marketing strategies "to intentionally facilitate that illegal activity." (SI¶34.) First, Backpage's employees were trained to—and paid bonuses for—identifying prostitutes who advertised on rival websites, creating free ads on Backpage for them, and using the resulting Backpage ads to secure their business. (SI¶9.) Second, Backpage entered business arrangements with known prostitution services and websites to increase its volume of prostitution advertising. (SI¶10; *see* SI¶34.) For example, Backpage had a reciprocal link agreement with The Erotic Review (TER), a Yelp-like website where "johns" reviewed prostitutes they had purchased on Backpage, including descriptions of prices charged for specific sex acts. (SI¶10.)

Backpage paid The Erotic Review, which for years served as a leading source of referrals for Backpage. (SI¶¶10, 45-58.) Third, Backpage formed "affiliate" partnerships with, and paid fees to, several high-volume purchasers of prostitution ads. (SI¶¶59-67.) Fourth, Backpage helped pimps and prostitutes avoid detection by law enforcement, most notably by utilizing "moderation" measures to remove terms and pictures particularly indicative of prostitution—and then publishing a revised version of the ad without blocking the ad itself. (SI¶¶ 11, 34.) This editing didn't change the purpose of the ad (soliciting prostitution)—it only created a veneer of deniability for Backpage and its customers. (SI¶¶13, 68-152.)

As Defendants successfully oversaw and executed these strategies, they faced withering criticism from law enforcement, the news media, anti-trafficking organizations, U.S. Senate investigators and others who concluded—and notified Defendants—that the vast majority of Backpage's "adult" ads were for prostitution. (SI¶¶74, 86, 97, 105, 109, 111, 127, 131, 134, 140-41, 144, 146, 151). For example, representatives from the National Center for Missing and Exploited Children (NCMEC) informed Defendants Lacey, Larkin and Spear that a large portion of the ads on Backpage were blatant prostitution ads, many featuring children. (SI¶¶86, 97.) At one meeting, NCMEC presented a PowerPoint documenting how Backpage and The Erotic Review cross-advertised numerous victims. (Doc. 446-1 at 41-62.) NCMEC recommended measures to prevent trafficking, which Backpage declined to adopt. (SI¶ 134.) The SI references several victims who were advertised on Backpage while underaged. (SI¶¶120, 123-25, 163, 164, 167, 169, 172.)

Count 1 of the SI charges Defendants with a 14-year conspiracy to violate the Travel Act by facilitating prostitution. (SI¶¶195-99.) Counts 2-51 identify 50 examples of prostitution ads that Defendants published in the course of that conspiracy. (SI¶¶ 200-01.) Counts 52-100 charge various Defendants with money laundering conspiracy and several specific money laundering counts. (SI¶¶202-11.)

Defendants' characterization of the SI as involving only the 50 ads in Counts 2-51 is erroneous. (Mot. at 2.) Their assertion is based on an isolated quote from a May 4, 2020 Order, which then explained that the ads in Counts 2-51 were part and parcel of "a

continuous course of conduct where Defendants facilitated 'unlawful activity' [including] numerous pimps, prostitutes and traffickers in violation of the Travel Act." (Doc. 946 at 13-14.) Defendants cite another out-of-context statement, made while explaining that this case is focused on "these defendants" rather than Backpage—which had already pleaded guilty. (Ex. N at 38.) Defendants' misreading is directly at odds with the SI, which alleges a continuous criminal conspiracy from 2004-2018—as this Court has repeatedly confirmed. (SI¶¶195-199, 202-203; *see* Doc. 793 at 19-20 (Oct. 14, 2019 Order) (discussing *Pinkerton v. United States*, 328 U.S. 640, 646-67 (1946), and holding "[t]he alleged facts in the SI, taken as true, establish defendants had the specific intent to promote prostitution in violation of the Travel Act. They conspired together to do so. The conspiracy was successful and resulted in the fifty ads for prostitution that now make up fifty counts of violating the Travel Act."); Ex. F at 7 (denying motion for mistrial; ruling that other acts during the conspiracy—*including publication of ads other than the 50 identified in Counts 2-51*—were "all in furtherance of the charge[d] conspiracy"); Doc. 1275 at 8-11.)

## II. THE UNITED STATES WORKED DILIGENTLY FOR YEARS TO BRING THIS CASE TO TRIAL.

From April 2018 to August 2021, the parties engaged in extensive pretrial litigation, evidenced by more than 1200 entries in the Clerk's Docket. Defendants filed six motions to dismiss that the United States vigorously opposed—and the Court denied. (*See* Docs. 559, 793, 840, 844, 946, 1168.) By January 2019, the United States had produced approximately 7.8 million documents in discovery. (Doc. 444.) While the United States strove to move this case to trial at the earliest practicable date, Defendants sought several continuances. (*See, e.g.*, Docs. 862, 990, 1058, 1113.) Trial finally began September 1, 2021, and the United States scheduled more than 70 witnesses from around the country to testify over the next ten weeks. (*See* Ex. J at 5 ("90 percent of [the United States'] witnesses are from out of state that we're flying in"); Doc. 1314.)

### III.    THE COURT RULED THE UNITED STATES COULD REFER TO CHILD SEX TRAFFICKING AT TRIAL.

In its May 7, 2021 pretrial Order, the Court ruled the United States could present evidence regarding sex trafficking and child sex trafficking. The Court agreed that:

> Sex trafficking and child sex trafficking are, by definition, both forms of prostitution. Both are simply a subset of the crime. Sex trafficking and child sex trafficking require victims to engage in sex in exchange for payment, and the Government must prove that Defendants intended to facilitate prostitution through Backpage.com. Evidence that tends to prove that Defendants were aware that Backpage.com was being used to facilitate sex trafficking and child sex trafficking are extremely probative to show notice to Defendants that the website was being used for illegal purposes.

(Doc. 1156 at 3.) The United States could not "linger on the details of" victims' abuse, but could present "evidence of the fact that people were trafficked using Backpage.com at trial" subject to specific objections. (*Id*. at 4.) The United States could also introduce testimony relating to victims' use of Backpage, notice to Backpage that prostitutes were using their website, and "how ads were created, drafted, edited, and paid for." (*Id*. at 5.)

While Defendants assert jurors were "much less likely to be fair and objective if the trial involved sex trafficking and child sex trafficking" (Mot. at 3), the Court's Order recognized that explaining how Defendants' website operated, and what kinds of ads it promoted, would involve discussion of these topics at trial.

### IV.    THE UNITED STATES DID NOT USE ITS OPENING STATEMENT TO PROVOKE A MISTRIAL.

The record contains no evidence to support Defendants' assertion that the United States "used its opening to provoke a mistrial." (Mot. at 3.) Before openings began, the Court stated that "they [the United States] aren't prohibited from using the word trafficking," but cautioned the government not to focus its "whole opening" on that topic. (Ex. D at 31.) The Court told defense counsel: "[I]f you think he's crossing the line, I know maybe you disagree about where the line should be, . . . you can object." (Ex. D at 32.)

Defense counsel asserted six objections to portions of the United States' opening statement that referenced trafficking, most of which were overruled. (*See* Ex. E at 5, 28, 29, 33, 44-45, 56-57.) After the prosecutor concluded, Defendants moved for a mistrial based on a litany of issues. The Court responded: "[W]ith respect to comments about

children trafficking, I've already ruled on that. And the government didn't cross the line on that issue, in my mind, because they didn't go into any of the details. It was merely the fact that this happened." (Ex. E at 70.) Even after the parties submitted written briefs, the Court again rejected Defendants' assertion "the government committed error by referencing child trafficking." (Ex. F at 8.) Rather, as the Court reaffirmed, "the fact that child trafficking and sex trafficking occurred on the website was not precluded by my earlier order. The Court has previously found that child sex trafficking and adult sex trafficking is a subset of prostitution, so that was not precluded." (Ex. F at 8.) This record evinces no intent to provoke a mistrial or violate any Court rulings.

## V.   THE UNITED STATES' FIRST WITNESS PROVIDED A DEVASTATING OVERVIEW OF DEFENDANTS' WEBSITE.

When one of the defense lawyers asserted—on only the second full day of testimony—that "we still have heard no connection of anything to any defendant or any ad in the indictment," the Court responded: "[I]t's way too early to make that argument, because I can envision from the evidence that I've already seen where they're going to get to that. It's way too early. We're barely, I don't know, ten percent in." (Ex. L at 68-69.)

The Court was exactly right. The trial was anticipated to run from September 1 through December 3, 2021, covering ten trial weeks. It was not until Trial Day 6 when the jury heard its first full day of testimony. (Exs. I-J.) When Defendants moved for a mistrial mid-afternoon on Trial Day 7, the United States had presented testimony from only four of its more than 70 anticipated witnesses (Doc. 1314), and introduced only a handful of its more than 1,800 listed exhibits (Doc. 1313.) The United States had barely started, and it was "way too early" to argue the sufficiency of the evidence. (Ex. L at 69.)

Defendants' related assertion that California Department of Justice Special Agent Supervisor Brian Fichtner's testimony "undermine[d]" the United States' "entire case"— and thereby caused the prosecutors to instigate a mistrial—is meritless in the extreme.  (*Cf.* Mot. at 4-7.) The United States called Agent Fichtner as its first witness to provide the jury with an overview of how the Backpage website appeared to the general public in 2015 (*see*

1    Doc. 931 at 22-23)—and he excelled at that introductory task.

2          Agent Fichtner's testimony centered on showing the jury an approximately 30-
3    minute video he recorded in March 2015 of his review of the Backpage website and his
4    placement of two undercover ads. (*See* Ex. G at 56-62.)[2] He showed the jury Backpage's
5    Sacramento homepage and "Escorts" section, lists of ads appearing in that section, the
6    contents of many of those ads, and "gallery" (or thumbnail) views of 300 ads published in
7    that section in the 27 hours preceding his recording. (*See* Ex. G at 62-77; Ex. I at 30-37.)
8    He described several common characteristics of these ads, including an "opening
9    description" that is "[k]ind of a proposition," terms including "incalls," "outcalls," "100%
10   independent," "QK" (or "quickie"), phrases like "I'm in town for a short time," prices for
11   15-, 30- and 60-minute time increments, and photos or videos of women in lingerie or
12   partially or entirely nude. (*See, e.g.*, Ex. G at 58-59, 68-69; Ex. I at 59; Ex. K at 97, 99.)
13   The ads' propositions included, among others: "I love to take my time pleasing you. I never
14   rush"; "I am here to please and excite you in every way, from my lips to my hips." (Ex. G
15   at 69-70, 72, 74; Ex. I at 59; Ex. J. at 81, 84.)

16         Agent Fichtner crafted an undercover ad that incorporated many of these
17   characteristics; after the ad went "live" on Backpage, it generated some 200 text messages
18   and 130 calls from different phone numbers that "were directed towards soliciting sex for
19   money." (Ex. I at 20-21, 43-44.) He later discussed prostitution ads with Backpage general
20   counsel Elizabeth McDougall, who didn't deny their prevalence on Backpage: "I pointed
21   out that . . . almost of all of these advertisements just looked like blatant prostitution ads.
22   And each time I raised that, you known, she never dissuaded me from that. She basically
23   said the Internet and prostitution is not going away." (Ex. I at 48-49.)

24         While he also testified that the ads he reviewed with the jury did not offer the
25   exchange of sex for money *in express terms*, and he knew of no arrests based on such ads
26   alone (Ex. K at 85; Ex. J. at 116-18), he wasn't allowed to opine on the issue of whether

27

28   ---
     [2] Agent Fichtner's March 2015 video, which was admitted at trial as Exhibit 489A, was
     provided to the Court on a DVD on April 21, 2020. (Doc. 931 at 22-23 n.11.)

specific ads offered prostitution; nor was he called to provide expert testimony. (*See* Ex. J at 96-100.) Other witnesses addressed those topics. After he testified, Dr. Sharon Cooper—a designated expert—defined several coded prostitution terms, including "100 percent independent" (the seller is in charge of themselves, rather than under the control of another), "quickie" ("a very short sexual encounter," such "as a blow job, which is oral sex, or a hand job"), "Greek" (anal sex), and "BBBJ" ("Bare Back Blow Job," or oral sex without a condom). (Ex. L at 40-46.) Another witness, Jessika Svendgard, defined terms in the Backpage ads that facilitated her prostitution. (*See* Ex. J at 13 ("In call means that people can come to your location, and out call means you can go to them").) Her ads didn't expressly offer sex for money; rather, "[w]e would try to clean the add up a little bit to make it less obvious to law enforcement that we were committing a crime." (Ex. J at 12.)

The United States planned on calling scores of additional witnesses to testify about the true nature of Defendants' "Escorts" advertising, including: Backpage CEO Carl Ferrer, who had already pleaded guilty and admitted that the vast majority of Backpage's adult and escort ads were for illegal prostitution (18-CR-464, Doc. 7-2 at 12-13); Backpage's Sales and Marketing Director Dan Hyer, who had similarly pleaded guilty and admitted that "the great majority of the ads being 'moderated' were actually offering illegal prostitution services—our removal of explicit words and pictures did nothing to change the services being offered" (Doc. 271 at 10); victims that were advertised for prostitution on Backpage; former "moderators"; representatives of NCMEC, law enforcement, and other organizations who repeatedly put Defendants on notice that Backpage was the internet's leading marketplace for prostitution solicitations; and numerous others. (*See* Doc. 1314.)

## VI.     THERE WAS NO INTENTIONAL MISCONDUCT.

Nor did the United States engage in "repeated, obvious, and calculated violations of this Court's clear rulings with each witness." (*Cf.* Mot. at 5.) Agent Fichtner did not testify about child sex trafficking. The United States' questioning of its three other witnesses reveals no intent to bring about the trial's early termination.

### A.    Jessika Svendgard

The United States paused Agent Fichtner's direct examination so that it could call Jessika and Nacole Svendgard, both of whom had traveled across the country to appear. Jessika is identified as Victim 4 in the SI ¶163, which alleged:

> In or around 2010, Victim 4 was sold for sex, through the use of Backpage ads, in Washington. During this period, Victim 4 was a juvenile (15 years old). Victim 4's pimp drafted the ads that were placed on Backpage. The wording of these ads was edited by Backpage before publication. The ads contained words and phrases such as "W'E'L'L  W'O'R'T'H  I'T***^***150HR" and "IT WONT TAKE LONG AT ALL" and included pictures of Victim 4 in provocative positions showing her breasts and buttocks.

On September 8, 2021, the Court ruled that Jessika's testimony "is relevant" but stated "you can't go into the life of her while she was being trafficked." (Ex. G at 105.) In response, the prosecutor outlined the following anticipated areas of testimony:

> [S]he's just going to say, "Look, I had a pimp. The pimp posted me on Backpage. He took pictures of me. He crafted the text. On some occasions, I crafted the text. He posted me. The phone rang. I did three to four tricks a night." . . . . [¶] [S]he will talk in limited terms about the sexual activities she had with these men who kept the money, but the reality is she was very much involved in the -- she testified in a criminal case in Seattle regarding the prosecution of the pimp.

> Obviously, there are certain preliminary questions I have to ask her to set up the story, but I don't intend to dwell on, you know, her -- her life during that time period, the day-to-day life as being pimped out and trafficked.

(Ex. G at 105.) The Court agreed "the victim can testify as to most of what you said." (Ex. G. at 107.)

Just before Jessika testified, Defendants filed a motion to limit her testimony. (Ex. I at 60; Doc. 1295.) The Court and the prosecutor engaged in the following colloquy:

> THE COURT: Okay. So I'm going to allow her testimony, but it's going be really limited. I mean, she's allowed to testify that she was trafficked by her pimp through Backpage and that she filed suit, but I don't know what else you anticipate getting into.

> MR. RAPP: I anticipate -- I anticipate her to testify that she was trafficked by being posted on Backpage, yes, and that people paid money to post her ad . . . . [¶] They used Visa cards to post her. They paid for the ads. All of those things that are relevant to a business enterprise. They paid for the hotels that she was at. They paid for her clothes. Those are relevant to the business enterprise. They reposted her ad, kind of like what we saw this morning, again and again. And then of course she filed suit against them and was

deposed by Backpage attorneys, including Liz McDougall was present there during the testimony, who was an agent of theirs.

(Ex. I at 65.) The Court then ruled: "She going to be allowed to testify. If she doesn't have the foundation, she's not going to be allowed to answer those questions."(Ex. I. at 67.)

As her testimony proceeded, Jessika explained how another prostitute had posted her on Backpage, which resulted in calls from men who called to arrange to have sex with them for money. (Ex. I at 70-71, 76-77.) When asked "did you have sex with them?," Jessika answered "I was 15, and I was not the age of consent. I was raped." (Ex. I at 77.) The question posed, however, did not ask if she was "raped," and the Court sustained a defense objection that "[t]hat's not the question that was asked." (Ex. I at 77.) After she described a fight and "hid[ing] in the back of the motel under a mattress," the Court told the prosecutor at a sidebar "these details are violating my order that you not go into the sort of details of her life as a prostitute" and "you need to be very careful." (Ex. I at 77-79.)

Following that sidebar, the prosecutor focused the remainder of his examination on Jessika's advertising on Backpage and the fact that such advertising facilitated her prostitution. Jessika testified she had next met a pimp, Baruti Hopson, and was with him for approximately 105 days, during which time he took photos of her and created Backpage ads, and as a result Jessika received calls from johns – "people paying for sex." (Ex. I at 80-82.)[3] The prosecutor elicited testimony about how Hopson paid for Jessika's Backpage ads, and how she engaged in prostitution until recovered by police. (Ex. I at 83-89.) The prosecutor had her authenticate and discuss several of her Backpage ads, including times Backpage modified her ads. (Ex. I at 89-91; Ex. J at 11-17.) Finally, the prosecutor confirmed that Jessika had been deposed in a civil suit against Backpage. (Ex. J at 18-19.)

While Defendants assert they "objected more than 27 times" (Mot. at 7), the transcript shows that after the sidebar, the Court sustained seven foundation and six relevance objections, and overruled the rest. (Ex. I 80-89; Ex. J. at 11, 16, 51-53.)

---

[3] Defendants complain that the prosecutor referenced in multiple questions the 105-day period Jessika was with Hopson. (Mot. at 6 n.2.) Yet defense counsel did not object to these references at trial, and they accurately reflected the time period at issue.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.    Nacole Svendgard

Jessika's mother, Nacole, testified next. After the parties briefed and argued the scope of her testimony, the Court ruled that "the fact that her daughter was posted on Backpage I see as relevant." (Ex. I at 8.) Meetings that Nacole had with public officials about her daughter's trafficking could be discussed in a limited fashion, and "of course you can talk about her confrontation with Mr. Lacey." (Ex. I at 14-15.) However, Nacole could not cover "the prosecution of [Jessika's] pimp." (Ex. I at 14.)

The prosecutor hewed to these limits. Nacole testified briefly about her involvement in meetings with public officials about her daughter's trafficking, her confrontation with Defendant Lacey when they both were called to testify before the U.S. Senate, and her civil litigation against Backpage. (Ex. J at 54-69.) While Defendants claim that they "repeatedly objected" (Mot. at 7), the Court overruled more objections that it sustained. (Ex. J at 55-61, 65-67, 77.) And contrary to Defendants' assertions, the government did not "repeatedly ask" about the prosecution of Jessika's pimp. (Mot. at 7.) Nacole merely referenced that case as one of the sources of her knowledge of her daughter's advertising on Backpage, and mentioned she had been contacted by a reporter from one of Defendants Lacey and Larkin's publications (the *Seattle Weekly*) during the pimp's trial. (Ex. J at 56-58.) The prosecutor asked no questions and elicited no testimony about anything that occurred at that trial. (Ex. J at 56-58.) The prosecutor then complied with a sidebar ruling that he not ask about an amicus brief in Nacole's civil suit. (Ex. J at 61-63.)

Defendants' claim that Nacole "provided no information about the 50 charged ads or any count in the [SI]" (Mot. at 5) is similarly misplaced. The United States focused its examination on her role as a notice witness. After she testified about her meetings with public officials advocating for legislation to prevent trafficking on Backpage, she identified Defendant Lacey as the person who, while turning to her as she passed him in the halls of the U.S. Senate, "said, if these fucking yahoos would just keep their mouths shut." (Ex. J. at 68-69.) This testimony was specifically contemplated by the Court. (*See* Ex. I at 14-15.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.    Dr. Sharon Cooper

The evening before Dr. Cooper was to testify, Defendants filed a motion in limine to preclude her. (*See* Ex. K at 5.) The next morning, the prosecutor explained that Dr. Cooper would address two areas—how sex trafficking occurs online, and the terminology and vernacular used in the trafficking and prostitution industry. (Ex. K at 5.) The Court denied the motion to preclude. (Ex. K. at 10.)

After Dr. Cooper provided foundational testimony about her background, the prosecutor moved to have Dr. Cooper "qualified as an expert in the area of how trafficking occurs through online media platforms, and also terminology and [the] vernacular used in sex trafficking and prostitution industry." (Ex. L at 17.) The Court denied a defense request to "voir dire the witness" and ruled "[t]he government may proceed." (Ex. L at 17.)

Shortly after starting her substantive testimony, Dr. Cooper testified that she learned from briefings by law enforcement and/or child protective services agencies that "victims were most commonly being sold from Backpage." (Ex. L at 25-26.) Defense counsel objected on hearsay grounds, and the Court called a sidebar and explained "Rule 702 gives the expert some leeway, so you can have a continuing objection, but as long it's something she used in her experience, it's coming in under 702." (Ex. L at 26.) During the sidebar, defense raised a separate relevance/Rule 403 objection regarding what the defense considered to be excessive references to children. (Ex. L at 26-27.) After further argument, the Court cautioned the prosecutor that "you need to be careful, because you're getting close to a 403 violation." (Ex. L at 28.) As Defendants admit, the Court then stated "using the phrase 'sex trafficking' was acceptable but that the government and its witnesses must 'stay away from the child sex trafficking.'" (Mot. at 9, quoting Ex. L at 29.)

After the sidebar, the prosecutor tried to avoid questions that might call for discussions of minor victims. (*See* Ex. L at 30-39.) Despite these efforts, Dr. Cooper at one point testified that the "overwhelming majority" of victims she had evaluated over the last 10 years "have been sold on Backpage," and the majority of those victims "were underage minors." (Ex. L. at 39.) The Court sustained objections to further questioning about

"victims," and the prosecutor turned to the issue of nomenclature used in the prostitution industry. (Ex. L at 40-48.) Dr. Cooper's testimony about such terminology did not concern children, and the prosecutor avoided asking about terms that might have done so (*e.g.*, "amber alert," "Lolita"). The final portion of her testimony involved two-transcript pages' worth of discussion about a call she received from Backpage's general counsel. (Ex. L at 51-53.) The Court overruled Defendants' relevance objections to that testimony. (Ex. L at 51.) Overall, while Defendants assert they "objected more than 50 times" (Mot. at 8-9), the Court overruled nearly two-thirds of their objections. (Ex. L at 8-53.)

On this record, there was no intentional misconduct, and certainly no intentional effort to bring about an abrupt end to this long-delayed trial.

## VII.  THE MISTRIAL RULING WAS LARGELY BASED ON CONCERNS ABOUT "CUMULATIVE" CHILD SEX TRAFFICKING REFERENCES.

During Dr. Cooper's cross-examination, defense counsel renewed their mistrial motion regarding the witness's repeated references to child sex trafficking. (Ex. L at 66-67.) The Court granted the motion the next morning. The Court stated it had given the United States "some leeway" at the beginning "because child sex trafficking and sex trafficking are forms of prostitution," "[y]et in the opening, and with every witness thereafter, it seems, the government has abused that leeway." (Ex. M at 4.) The Court listed examples of Dr. Cooper addressing child sex trafficking, Jessika Svendgard testifying about being abused as a trafficking victim, and referenced other testimony. (Ex. M at 4-5.) The Court concluded: "**So although I don't see any of these as intentional misconduct**, the cumulative effect of all of that" led to the mistrial ruling. (Ex. M at 5 (emphasis added).) The Court later set a new trial for February 9, 2022, and a status hearing to discuss juror questionnaires for January 31, 2022. (Doc. 1336; *see also* Doc. 1377.)

Argument

## I.   RETRIAL IS NOT BARRED BY THE DOUBLE JEOPARDY CLAUSE.

### A.   Defendants Must Prove that the United States Deliberately Sabotaged the Trial—an Extraordinary Standard that Is Almost Never Met.

The Double Jeopardy Clause generally does not apply where—as here—the Defendants have obtained a mistrial. *United States v. Tateo*, 377 U.S. 463, 467 (1964). In *Kennedy*, the Supreme Court identified a single, exceedingly "narrow exception" to this rule: "Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." 456 U.S. at 676. *Kennedy* rejected a broader exception, suggested by prior cases, that encompassed "'bad-faith conduct by [the] judge or prosecutor' [that] threatens the '[h]arassment of an accused by successive prosecutions [or] afford[s] the prosecution a more favorable opportunity to convict,'" *id*. at 674 (quoting *United States v. Dinitz*, 424 U.S. 600, 611 (1976)), or other instances of "prosecutorial or judicial overreaching.'" *Id*. at 678 (quoting *United States v. Jorn*, 400 U.S. 470, 485 (1971)).

*Kennedy* clarified that only prosecutorial conduct deliberately and intentionally aimed at sabotaging the first trial will trigger the exception. This narrow exception "prevents prosecutors from sinking a case they knew was doomed to end in an acquittal in the hope of having better luck before a second jury." *United States v. Lewis*, 368 F.3d 1102, 1108 (9th Cir. 2004). "[I]n the language of veteran trial lawyers, the Double Jeopardy Clause bars retrial when a prosecutor's misconduct aims to 'burn' the jury, but not when he merely aims to convict the defendant by methods foul." *Lopez-Avila*, 678 F.3d at 962. "'[I]t doesn't even matter that [the prosecutor] knows he is acting improperly, provided that his aim is to get a conviction. The only relevant intent is intent to terminate the trial, not intent to prevail at this trial by impermissible means.'" *Id*. (citation omitted). This exacting standard "is rarely met." *Id*. "'Even when the government's actions remove[ ] any meaningful choice for defendants between pushing on with the trial or seeking mistrial,'

- 15 -

1    defendants bear the heavy burden of proving that the prosecutor 'intended' the results."

2    *Tyler v. Barnes*, 2015 WL 6537149, at *15 (E.D. Cal. Oct. 28, 2015) (quoting *Lun*, 944

3    F.2d at 646). For several reasons, Defendants cannot meet their "heavy burden" here.

4        **B.    Defendants Have Failed to Meet *Kennedy*'s Exacting Standard.**

5            1.    *The United States Strenuously Opposed a Mistrial*.

6        First, the United States strongly opposed Defendants' motions for mistrial—

7    demonstrating the government's *lack* of intent to end the trial. *See United States v. Fowlkes*,

8    804 F.3d 954, 972 (9th Cir. 2015); *United States v. McKoy,* 78 F.3d 446, 449 (9th Cir.

9    1996); *Lun*, 944 F.2d at 644. When Defendants raised their mistrial motion following the

10   prosecutor's opening statement, the United States opposed Defendants' assertions. (Ex. E

11   at 67-72.) The Court agreed with the United States' position regarding comments about

12   child sex trafficking: "I've already ruled on that. And the government didn't cross the line

13   on that issue, in my mind, because they didn't go into any of the details." (Ex. E at 70.)

14   The United States then worked through the ensuing holiday weekend to prepare a

15   comprehensive 17-page response to Defendants' motion. (Doc. 1275.) On September 8,

16   2021, the Court denied Defendants' motion in its entirety. (Ex. F at 7-11.)

17       Defendants next sought a mistrial after Dr. Cooper provided foundational testimony

18   explaining her background, which involved working with victims of underage sex

19   trafficking. The prosecutor reiterated the arguments that undergirded the United States'

20   previous (and successful) briefing on this issue. (*See* Ex. L at 28.) When Defendants again

21   raised the issue at an afternoon break, the prosecutor resisted Defendants' arguments and

22   grounded his position in the Court's prior rulings. (*See* Ex. L at 72-73.) In sum, the United

23   States strongly opposed all of Defendants' mistrial motions—a factor that weighs against

24   a finding of prosecutorial intent to cause a mistrial. *E.g., Fowlkes*, 804 F.3d at 972.

25           2.    *The Court Found No Intentional Misconduct*.

26       Second, the Court made an express finding that the prosecutors' actions giving rise

27   to the mistrial ruling were *not* intentional. (Ex. M at 5.) The judge who made that finding

28   had numerous opportunities to observe the prosecutors' conduct during the two-and-a-half

- 16 -

years she presided over pretrial preparations, and during the trial. *See Lun*, 944 F.2d at 644 (crediting trial court's findings of non-intentionality based on judge's lengthy observation of the prosecution team pretrial and during trial). The Court's finding is consistent with several critical parts of the record.

Pre-trial, the Court ruled the United States could present evidence regarding sex trafficking and child sex trafficking—which the Court recognized are "both forms of prostitution"—provided it did not "linger on the details of the [victims'] abuse." (Doc. 1156 at 3-4.) Then, before, during and after the United States' opening statement, the Court indicated that the United States could reference trafficking, including child sex trafficking. Before openings began, the Court stated that "they [the United States] aren't prohibited from using the word trafficking" (Ex. D at 31); the Court overruled most defense objections on this issue (Ex. E at 5, 28, 29, 33, 44-45, 56-57); and when Defendants moved for a mistrial that day, the Court ruled "the government didn't cross the line on that issue." (Ex. E at 70.) After briefing, the Court reaffirmed "the fact that child trafficking and sex trafficking occurred on the website was not precluded by my earlier order." (Ex. F at 8.)

The Court's rulings regarding Jessika Svendgard's testimony similarly did not evince any findings of intentional misconduct, let alone give the United States reason to believe Defendants could obtain a mistrial. Before Jessika started testifying, the Court ruled her testimony "is relevant" but reminded the prosecutor "you can't go into the life of her while she was being trafficked." (Ex. G at 105.) When the prosecutor outlined several areas of anticipated testimony (Ex. G. at 105), the Court found: "the victim can testify as to most of what you said." (Ex. G at 107). Later, when the prosecutor listed topics he proposed to ask about, including the details of how she was advertised on Backpage and her traffickers' "business enterprise," the Court allowed the testimony to proceed. (Ex. I at 65-67.) While she referenced being "raped" in an answer to a question, the question did not ask if she was "raped," and the Court sustained an objection that "[t]hat's not the question that was asked." (Ex. I at 77.) After she mentioned a fight, the Court told the prosecutor at a sidebar "these details are violating my order that you not go into the sort of details of her life as a

prostitute." (Ex. I at 77-79.) Following that sidebar, the prosecutor took care to focus on Jessika's advertising on Backpage and how it facilitated her prostitution. (Ex. I at 80-89.) There was no "intentional misconduct." (Ex. M at 5.)

The same is true regarding the United States' examination of Nacole Svendgard, who testified about her meetings with public officials regarding her daughter's trafficking, her confrontation with Defendant Lacey when they both were called to testify before the U.S. Senate, and her litigation against Backpage. (Ex. J at 54-69.) Defendants claim that they "repeatedly objected" to the prosecutor's questions (Mot. at 7), but the Court overruled more objections that it sustained. (Ex. J at 55-61, 65-67, 77.) Nor did the government "repeatedly ask" about the prosecution of Jessika's pimp. (Mot. at 7.) The prosecutor asked no questions about anything that occurred at that trial. (Ex. J at 56-58.) He also complied with a sidebar ruling regarding references to an amicus brief. (Ex. J at 61-63.)

The United States likewise did not engage in intentional misconduct involving Dr. Cooper. Rather than "ignore[ ] the Court's warnings" at a sidebar early in her examination. (Mot. at 9; Ex. L at 28-29), the prosecutor spent the balance of his examination trying to steer away from discussions about children. (Ex. L at 30-39.) When, despite these efforts, Dr. Cooper testified that the "overwhelming majority" of victims she had evaluated were minors "sold on Backpage" (Ex. L. at 39), the prosecutor  turned to the issue of nomenclature in the prostitution industry—and studiously avoided asking about terms like "amber alert" or "Lolita" that might have prompted discussions about underage victims. (Ex. L at 40-48.) Defendants further complain that portions of Dr. Cooper's answers "opined on the ultimate issues" (Mot. at 9)—yet their objections were overruled (Ex. L at 41, 44), and the rules permit expert testimony on such issues. Fed. R. Evid. 704(a)-(b). The Court correctly determined none of this constituted "intentional misconduct." (Ex. M at 5.)

### 3.   *The Government's Case Was Not "Faltering."*

Third, Agent Fichtner showed the jury what Backpage actually looked like in 2015, including its Adult Escorts section, and described several common characteristics of Backpage's Escorts ads. (*See supra* at 7-8.) When he posted an undercover ad that

incorporated several of these characteristics, the ad generated more than 300 unique responses "directed towards soliciting sex for money." (Ex. I at 43-44.) And when he confronted Backpage's general counsel about the prevalence of blatant prostitution ads on the website, she did not dissuade him—but merely told him that the "Internet and prostitution is not going away." (Ex. I at 49.)

Agent Fichtner was not called to opine on whether specific ads were solicitations for prostitution. The United States had numerous other witnesses—including experts and victims who had been advertised for prostitution on Backpage—to explain the meaning of the ads to the jury. Rather, the purpose of his testimony was to introduce the jury to how Backpage's website looked and functioned. At this, he most definitely succeeded. His testimony provided no reason for the United States to sabotage the trial after only two full days of testimony.[4]

Furthermore, to accept Defendants' theory, one would have to believe the prosecution viewed Agent Fichtner's testimony as undermining its case (it did not), and then decided to call Dr. Cooper, "a self-proclaimed 'developmental and forensic *pediatrician*,'" to instigate a mistrial. (Mot. at 7.) This is conspiracy theorizing run amok. The prosecution disclosed Dr. Cooper as an expert witness more than two years before Agent Fichtner took the stand, and the Court—having been provided with Dr. Cooper's curriculum vitae—had already ruled that she could testify about "how victims are recruited and controlled and how the internet has changed the dynamics between the pimp and

---

[4] Defendants allude to the erroneous legal argument that the ads were "presumptively protected by the First Amendment" if they didn't expressly state an offer of sex for money. (*See* Mot. at 16.) Yet the law is clear that the jury may properly consider the totality of the text *and* context of the ads in determining the services offered, including the meaning of coded prostitution terms, prices with short time increments, nude or partially-nude photos, references to prostitution review websites like The Erotic Review, and other evidence. *See* Doc. 1216-3 at 185-87; *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 388 (1973) (employment ads were unlawful based on the context of their placement in gender-specific categories, rather than their text). *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808 (9th Cir. 2013) (Mot. at 16 n.5), is not to the contrary. It recognizes the continuing validity of *Pittsburgh Press* and reaffirms that the First Amendment "extends no protection" at all to prostitution ads and solicitations. 709 F.3d at 822. *Accord*, *Erotic Service Provider Legal Ed. And Research Project v. Gascon*, 880 F.3d 450, 459-60, *as amended*, 881 F.3d 792 (9th Cir. 2018). Defendants cite no contrary Ninth Circuit authority.

prostitute," and "terms unique to the vernacular of the prostitution and sex trafficking subculture." (Doc. 1081 at 16; *see* Doc. 422-7 at 1-57;  Doc. 958 at 2-3.)

At bottom, Agent Fichtner's testimony gave the United States no cause to abort the trial, which had barely started. Defendants' Motion should be denied for this reason alone. *See Lopez-Avila*, 678 F.3d at 959-62 (affirming denial of motion to dismiss where district court found no evidence that intentional misconduct was part of a "strategy decision . . . to abort the trial"); *Lun*, 944 F.2d at 644 (defendants failed to establish prosecutor believed he would be better off with a new trial); *United States v. Curtis,* 683 F.2d 769 (3rd Cir. 1982) (affirming where there was no evidence the government feared acquittal).

4.    *The United States Is Prejudiced by the Mistrial.*

Fourth, Defendants' assertion the United States' "intent to goad" can somehow be inferred from advantages it would gain from retrying the case lacks merit. (*Cf.* Mot. at 15-16.) Both sides—not just the defense—have much to lose from having to start over in a second trial. When prosecutorial error occurs, "the prosecutor suffers substantial costs" whether or not the defendant choses to continue with the trial or seek a mistrial:

> If the defendant consents to a mistrial, the prosecutor must go to the time, trouble, and expense of starting all over with the criminal prosecution. If the defendant chooses to continue the proceeding and preserve his objection for appeal, the prosecutor must continue to completion a proceeding in which a conviction may not be sustainable.

*Kennedy*, 456 U.S. at 685-86 (Stevens, J., concurring). And if a mistrial is declared, "[w]itnesses may disappear or forget their testimony after the long delay [leading to the second trial]"; and delay nearly always prejudices the government—the party bearing the burden of proving guilt beyond a reasonable doubt—far more than the defense. *Lun*, 944 F.2d at 646. Such prejudice is particularly pronounced in cases, such as this, that involve lengthy trials with scores of witnesses traveling from all parts of the country. The prosecution team had worked for years to prepare. The United States had much to lose from having the trial abruptly terminated.

For their part, "[D]efendants benefit by retrial. They have had the opportunity to see a substantial portion of the government's case-in-chief. They will also have the opportunity

1   to portray [information from] the first trial in the most beneficial way for their position,

2   from the very outset." *Lun*, 944 F.2d at 646. Here, the last thing the prosecution wanted

3   was an abrupt early end to this long-delayed trial.[5]

4       **C.    Defendants Have Failed to Make a Colorable Double Jeopardy Claim.**

5       Judge Brnovich found that there was no "intentional misconduct." (Ex. M at 5.) As

6   shown above, the prosecutors vigorously opposed Defendants' efforts to seek a mistrial;

7   endeavored to conform their witness examinations to the Court's rulings; and had much to

8   lose from having the trial abruptly terminated. Simply put, there is nothing in the record

9   capable of supporting anything close to *Kennedy*'s burden of proving a deliberate strategy

10  to abort the trial. Particularly given the Court's finding of non-intentionality, "no set of

11  facts will support the assertion of a claim of double jeopardy" under *Kennedy*'s

12  intentionality-based standard. *Richardson v. United States*, 468 U.S. 317, 326 n.6 (1984)

13  (a "colorable claim" is one for which there is "some possible validity"). For all these

14  reasons, the United States respectfully requests that the Court deny Defendants' Motion—

15  and also find that Defendants' double jeopardy claim has no colorable basis on this record.

16  **II.   THE EXTREME SANCTION OF DISMISSAL IS NOT APPROPRIATE**
17       **UNDER DUE PROCESS OR THE COURT'S SUPERVISORY POWERS.**

        **A.    Defendants Cannot Obtain Relief Under the Due Process Clause.**
18

19      Defendants' alternative requests to dismiss this case under the Due Process Clause

20  or the Court's supervisory powers likewise should be denied. Defendants seek dismissal

21  under the Due Process Clause of the Fifth Amendment—a remedy that may be invoked

22  _____
    [5] Defendants' other double jeopardy cases are inapposite. Both *United States v. Kessler*,
23  530 F.2d 1246 (5th Cir. 1976), and *United States v. Martin*, 561 F.2d 135, 140 (8th Cir.
    1977), used the broader standard the Supreme Court rejected in *Kennedy*. *See United States*
24  *v. Singleterry*, 683 F.2d 122, 123 n.1 (5th Cir. 1982) (Pre-*Kennedy* decisions using "a more
    expansive double jeopardy bar—*i.e.*, that reprosecution is barred by any 'grossly negligent'
25  or intentional misconduct that 'seriously prejudices' the defendant . . . [are] no longer the
    law."). *Tibbs v. Florida*, 457 U.S. 31 (1982), and *United States v. Weems*, 49 F.3d 528 (9th
26  Cir. 1995), allowed retrial. In *United States v. Sterba*, 22 F. Supp. 2d 1333, 1335-37, 1341-
    42 (M.D. Fla. 1998), the prosecutor elicited false testimony, and in *Arizona v. Washington*,
27  434 U.S. 497, 510-11 (1978), defense counsel's prejudicial remarks prompted a mistrial;
    those decisions are miles away from this case.

28

                                        - 21 -

1    only when the government engages in "outrageous" conduct. (*Cf.* Mot. at 27-29.)

2    "Dismissing an indictment for outrageous government conduct, however, is 'limited to

3    extreme cases' in which the defendant can demonstrate that the government's conduct

4    'violates fundamental fairness' and is 'so grossly shocking and so outrageous as to violate

5    the universal sense of justice.' This is an 'extremely high standard.'" *United States v. Black*,

6    733 F.3d 294, 302 (9th Cir. 2013) (citations omitted). This relief is reserved only for truly

7    extreme cases, such as where the police have used "extreme physical or mental brutality"

8    against the defendant, or the government has engineered and directed a criminal enterprise

9    from start to finish. *Kearns*, 5 F.3d at 1253; *See also United States v. Kojayan*, 8 F.3d 1315

10   (9th Cir. 1993) (conviction reversed where prosecutor misstated key facts regarding a

11   central witness in closing argument). In addition to shocking and outrageous misbehavior,

12   a defendant must show the misconduct prejudiced his defense. *See United States v. Rogers*,

13   751 F.2d 1074, 1077 (9th Cir. 1985).

14        Defendants cannot make that extreme showing here. *First*, with respect to the

15   mistrial, if Defendants cannot meet the exacting *Kennedy* standard for barring a retrial on

16   double jeopardy grounds (and they cannot), then they cannot meet the even more

17   extraordinary standard that applies to due process dismissals. This is not a case of "extreme

18   physical or mental brutality"; nor was the Court's mistral ruling based on any type of

19   extreme trial misconduct of the kind referenced in the foregoing cases.

20        *Second*, Defendants' arguments regarding discovery of materials from a wholly

21   separate investigation of Backpage conducted a decade ago in the Western District of

22   Washington (WDWA) likewise fail to justify this extreme form of relief. (Mot. at 28.) As

23   explained below, the central problem with Defendants' argument is that it presupposes

24   something that has never been found in this case—namely, that any discovery violations at

25   all have occurred regarding the WDWA investigation. If anything, the record is

26   diametrically to the contrary—the parties have litigated this issue, and Judge Logan ruled

27   in 2019 that                                                      (Doc. 449.)

28        *Third*, the analysis is much the same regarding Defendants' next alleged basis for

- 22 -

relief—supposed "invasions" of the attorney-client privilege. (Mot. at 28.) The Court has already ruled on that issue—against Defendants. (Doc. 1168.)

*Fourth*, Defendants assert the United States' seizures of certain assets have "impeded and restricted" their right to present a defense. (Mot. at 29.) Yet Defendants have never provided the United States with anything to substantiate that claim, and multiple courts have authorized the asset freezes. (*See, e.g.,* Docs. 446, 1384.) The request for relief under the Due Process Clause should be denied.

**B.    The Court Should Not Grant the Extreme Remedy of Dismissal Under its Supervisory Power.**

Defendants' request for dismissal under the Court's supervisor powers also should be denied. The court's exercise of its supervisory powers protects the integrity of the federal courts and prevents the courts from "making ... themselves accomplices in *willful disobedience* of law." *McNabb*, 318 U.S. at 345 (emphasis added). However, "these supervisory powers remain a harsh, ultimate sanction (which) are more often referred to than invoked." *Owen*, 580 F.2d at 367. "Because it is a drastic step, dismissing an indictment"—which prevents the case from proceeding at all—"is a disfavored remedy." *Rogers,* 751 F.2d at 1076-77. It "is an extreme sanction which should be infrequently utilized," *Owen*, 580 F.2d at 367, and "is impermissible absent 'a clear basis in fact and law for doing so.'" *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir. 1992).

Under its supervisory powers, a district court may dismiss an indictment with prejudice for prosecutorial misconduct only if it finds (1) "flagrant misbehavior" by the government that caused (2) "substantial prejudice" to the defense, and has concluded (3) "no lesser remedial action" is available to redress injury. *United States v. Bundy*, 968 F.3d 1019, 1031 (9th Cir. 2020); *Kearns*, 5 F.3d at 1253. Regarding lesser remedies, the Court may consider a range of options, including dismissing without prejudice and forcing the government to begin anew, limiting witnesses or testimony, and disciplinary or other sanctions. *Bundy*, 968 F.3d at 1031. A defendant "bears a heavy burden" when seeking the most extreme of all of these alternatives—dismissal with prejudice of criminal charges.

*United States v. Venegas*, 800 F.2d 868, 869 (9th Cir. 1986). For several reasons, Defendants cannot meet that heavy burden here.

>          1.      *The Mistrial Is a Severe Sanction for the United States' Trial Conduct.*

Contrary to Defendants' assertions, the United States' conduct at trial does not warrant the extreme, case-terminating sanction of dismissal with prejudice. As shown above, the Court ruled pretrial that the United States could introduce evidence regarding sex trafficking and child sex trafficking, but could not linger on details of victim abuse. The Court rejected all of Defendants' arguments regarding the opening statement, the prosecutors' attempted in good faith to adhere to the Court's rulings during the witness examinations, and the Court concluded that there had been no intentional misconduct. (Ex. M at 5; *see McNabb*, 318 U.S. at 345 (requiring "willful disobedience of law"); *Kearns*, 5 F.3d at 1255 (even though the government's conduct "may have been negligent, or even grossly negligent," it did not rise to the level of flagrant misconduct).

This case is nothing like *United States v. Aguilar*, 831 F. Supp. 2d 1180, 1187-98 (C.D. Cal. 2011) (Mot. at 18), where the district court granted a motion to dismiss after prosecutors had inserted a false statement into one FBI agent's affidavit, allowed another key FBI agent to testify untruthfully before the grand jury, made misleading factual representations in closing arguments, and engaged in a host of other misconduct. Nor is this case remotely analogous to *Lopez-Avila*, 678 F.3d at 958-61 (Mot. at 17-18), where the prosecutor deliberately misquoted impeachment material during his cross-examination of the defendant, and thereby elicited testimony that undermined her duress defense. The trial here is devoid of any remotely similar facts.

Moreover, while a mistrial can involve advantages and disadvantages for both sides, the mistrial here has substantially prejudiced the United States. (*See supra* at 20-21.) In the circumstances of this case, the mistrial itself is a sufficiently severe remedy for the events that led to the mistrial declaration.

2.   *Defendants' Brady Arguments Have Already Been Litigated and Rejected.*

Defendants' assertion that alleged *Brady* violations warrant dismissal is deficient. (Mot. at 19-22.) First, despite numerous accusations by Defendants about purported discovery violations (*see, e.g.,* Docs. 273, 531, 643, 662, 665, 740, 777), the Court has failed to find any. (Docs. 339, 768, 802, 839, 1028.) Judge Logan and Judge Brnovich denied two prior motions to compel production of *Brady* material. (Docs. 339 and 1028.)

Defendants' third motion to compel (Doc. 1281) concerns an issue decided by Judge Logan in January 2019. (Doc. 449-1.)

Nearly three years after Judge Logan issued his Order—and immediately following the Court's denial of Defendants' motion for acquittal or mistrial on the fourth trial day—Defendants attempted to resurrect this issue (Ex. F at 11-13) and filed their third *Brady* motion (Doc. 1281). That motion is fully briefed, and Defendants' *Brady* assertions in the instant Motion are largely borrowed from that motion. (*Compare* Doc. 1281 *with* Mot. at 19-22.) Accordingly, the United States incorporates herein the arguments made in its response to that motion. (Doc. 1326.) Suffice to say, Judge Logan unequivocally found—and it is law of the case—

These facts are nothing like *United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008), or *United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020) (Mot. at 19-22). In

*Chapman*, the AUSA failed to keep a log of disclosed and nondisclosed materials—and thereby could not verify that he had complied with *Brady* and *Giglio*, and failed to disclose impeachment materials until after the pertinent witnesses had testified. 524 F.3d at 1079, 1085; *id.* at 1079. In *Bundy*, the government started disclosing *Brady* material days *after* trial started—including numerous categories of evidence that "undermined the government's theory that the defendants *intentionally lied* about fearing government snipers surrounding the property." 968 F.3d at 1033; *see id.* at 1034-37. Here, a judge has already reviewed the underlying memoranda and found no obligation to disclose.

Defendants' assertion of a *Brady* violation regarding a legal opinion referenced in a WDWA grand jury transcript holds no water. (Mot. at 22-23.) The United States produced the transcript to Defendants on November 30, 2018. (*See* Ex. Q.)

1

2

3

4

5

6

7

8

9

10

11

12        In these circumstances,

13  *Brady* does not require disclosure of the underlying summer associate memorandum—

14  particularly when Defendants have known the memorandum's material substance for three

15  years. And this is certainly not enough to warrant the extraordinary result of dismissing

16  with prejudice all criminal charges in this case.

17        3.    *Defendants' Attempted Motion for Reconsideration on Privilege*
              *Issues Is Deficient on Every Level.*

18

19        Defendants' argument about the United States' purported privilege invasions lacks

20  merit. Defendants have already made this argument—in a motion with similarly hyperbolic

21  language—and lost. (Docs. 940, 998, 1020, 1168, RT  5/3/21, attached as Exhibit 1.) Now,

22  Defendants move for dismissal of the entire case based on this issue—without even

23  mentioning the Court's Order denying their previous motion, much less attempting to

24  counter the Court's findings or seeking formal reconsideration.

25        Defendants' argument is deficient because (a) they failed to establish that any

26  statements made by Carl Ferrer to the United States were privileged, and (b) even if the

27  communications had been privileged, that privilege has been waived. This fact is illustrated

28

by, among other reasons, a lengthy legal memorandum—disclosed to third parties—that discusses all of Defendants' legal defense theories in detail.

On May 1, 2020, Defendants filed a "motion to dismiss based on outrageous government misconduct invading attorney-client privilege." (Doc. 940.) After full briefing and argument, the Court denied the motion on June 4, 2021. (Doc. 1168.) Defendants argued that the United States invaded Defendants' privileged communications when it interviewed Carl Ferrer. (Doc. 940 at 5-7.) Defendants then claimed that the United States acted "flagrantly" by "invading" their privilege, which caused them to suffer "substantial prejudice" and should result in the case being dismissed. (Doc. 940 at 15.) The instant Motion raises identical arguments. (Mot. at 22-23, 25-27.)

Defendants recently admitted to having waived their privilege on these issues—in a

1    manner that neither the Court nor the United States previously knew about. In July 2021,

2    Defendants disclosed multiple legal memoranda as potential trial exhibits.  (Doc. 1234 at

3    2.) One such memorandum is titled "Why Village Voice Media's Backpage.com Service

4    Does Not Create Liability for Promoting Prostitution" (the "Memorandum," attached as

5    Exhibit 2). The United States grew concerned Defendants would attempt to raise an advice

6    of counsel defense without expressly waiving the privilege beforehand, which is required,

7    so it filed a motion. (Doc. 1234.) Defendants then admitted the Memorandum "was

8    disclosed to third parties, including financial institutions, and, therefore, is not privileged."

9    (Doc. 1239 at 3, n.1.) It contains detailed analyses of Defendants' theories involving the

10    Communications Decency Act, the First Amendment and *mens rea*. (Ex. 2 .)[6]

11         In other words, Defendants disclosed to third parties a legal memorandum that

12    discusses, in detail, all of their legal theories—the same theories that were at issue in their

13    prior motion to dismiss on privilege issues that Judge Brnovich denied. Interestingly, this

14    is contrary to Defendants' representations.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[6] The Memorandum fails to analyze the prostitution marketing strategies Defendants utilized to help Backpage become the internet's leading prostitution ad marketplace.

1

2

3          This statement,

4   of course, isn't correct, as evidenced by the fact that the Memorandum was shared with

5   third parties.[7] Unbeknownst to the Court or the United States, Defendants' primary

6   argument in support of their motion to dismiss for outrageous government misconduct was

7   wrong. The argument in Defendants' instant Motion—that the United States invaded

8   Defendants' privilege through its interviews of Carl Ferrer—is wholly without merit.

9              4.      *Defendants' Arguments Regarding a Purported Violation of Filter
                       Team Protocols Lacks Merit.*
10

11          Defendants' assertion that the United States engaged in a "pattern and practice" of

12   violating the Court's Orders and Defendants' privileges as it relates to filter team practices

13   doesn't withstand the barest scrutiny. To put this argument in context, the United States

14   offers this brief outline the history of both the filter team litigation and some of the grand

15   jury litigation that occurred pre-indictment.

16              a.      *Brief History of Filter Team Litigation.*

17          On October 29, 2018, the United States filed a motion for clarification on whether

18   it could continue to utilize a filter team to review the potentially privileged materials in its

19   possession. (Doc. 355 at 3.) This filter process had previously been approved by two

20   magistrate judges. (Docs. 195-1, 195-2.) After Defendant filed an objection (Doc. 409),

21   Judge Logan granted the United States' motion, finding "the filter team is the most efficient

22   way to advance the Government's discovery review." (Doc. 445 at 2.) Defendants then

23   filed a motion for further clarification, urging the Court to adopt new rules governing the

24

25

26   _____

     [7] In addition, Ferrer never provided anything close to the detail that is provided by the
27   Memorandum. Ferrer merely identified the legal defense theories in his interviews with the
     United States, while the memorandum goes into painstaking detail about the legal support
     for each theory. Further, the United States was intimately familiar with Defendants' legal
28   theories before it ever spoke with Ferrer. (*See* Doc. 998 at 10-12.).

filter team. (Doc. 452.) Judge Brnovich denied Defendants' motion and affirmed filter team protocols that three other judges had already approved. (Doc. 545; Doc. 577 at 11-12.)

The United States, both in its response to Defendants' motion for further clarification (Doc. 462) and at a hearing (Doc. 577 at 7-9), explained how the filter process would work. The filter team would review the segregated documents and organize the documents into three categories vis-à-vis the attorney-client privilege: not protected; potentially protected; and presumptively protected. (Doc. 462 at 1-2; Doc. 577 at 8.) If the communications weren't protected by the privilege, then the filter team would produce those documents to the prosecution team.[8] On May 15, 2019, the United States memorialized its filter team instructions, which were consistent with the protocol approved previously by the Court. (Doc. 1023 at Ex. A.)[9]

                b.      *Judge Campbell's Order Compelling Backpage to Produce Third Party Communications.*

Before the United States charged Defendants, the parties engaged in extensive litigation related to document production in compliance with grand jury subpoenas. (Doc. 780 at Ex. 13.) On April 2, 2018, Judge Campbell issued an Order compelling Backpage to produce all communications between its attorneys and representatives from public relations (PR) firms and an investment bank. (Doc. 780, Ex. 13 at Ex. K.) Judge Campbell found that any communications between Backpage's attorneys and PR firms weren't privileged. (*Id.*) Accordingly, these communications between third party PR firms and Backpage's attorneys could be disclosed to the prosecution team.

---

[8] The Court rejected Defendants' demand that *all* non-privileged documents be produced to them before disclosure to the prosecution team. (Doc. 452 at 2-3; Doc. 577 at 5-13.)

[9] Defendants' reliance on *United States v. Pedersen*, 2014 WL 3871197 (D. Or. Aug. 6, 2014) is misplaced. (Mot. at 25.) In that case, the prosecution made multiple errors not present here. The filter team instructions were neither submitted, nor approved, by the Court. *Pedersen*, 2014 WL 3871197, at *16. The filter team protocol in *Pedersen* allowed filter team members to intentionally review privileged material and permitted an AUSA to work on both the filter team and prosecution team. *Id.* at *29. Finally, a number of the defendants' privileged legal communications were intercepted and reviewed by members of the prosecution team and the filter team. *Id.* at *12. *Pedersen* is inapposite.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              c.     *Defendants' Arguments About Filter Team Violations Have Previously Been Denied.*

On June 15, 2020, in their reply in support of their motion to dismiss on the privilege issue, Defendants raised the same argument that it included in the instant motion. (*Compare* Mot. at 24-25 *with* Doc. 1023 at 10-11.) In that reply, Defendants discussed a production from the United States of "955 emails sent to/from Defendants' counsel." (Doc. 1023 at 10-11.)[10] As in the instant Motion, Defendants utilized similarly colorful language. (Doc. 1023 at 11 ("The government has a serious problem with candor to the Court, with candor to Defendants, and with knowingly and intentionally invading Defendants' privileges.").) Defendants promised they would "raise the additional points with the Court soon." (*Id.*)

Despite receiving these documents nearly two years ago, Defendants have not filed a motion seeking redress regarding a specific communication they deemed privileged from this production. Instead, they trot out the same general arguments that the Court rejected when it denied Defendants' motion to dismiss (Doc. 1168), in the hopes that its inclusion would add weight to an otherwise meritless motion. This Court should reject such a ploy. The United States acted consistently with the filter team protocol that two magistrate judges and two district court judges approved. The prosecution team only received documents that had been appropriately determined by the filter team to be non-privileged.

---

[10] Defendants previously referred to "955 emails" but now refer to "966 documents." (*Compare* Doc. 1023 at 11 *with* Mot. at 24.) Both citations appear to reference the same December 2019 production. (Dec. 17, 2019 Ltr from R. Jones, attached as Exhibit 3.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>Conclusion</u>

Defendants' Motion to Dismiss with Prejudice (Doc. 1355) should be denied.

Respectfully submitted this 17th day of November, 2021.

GLENN B. McCORMICK
Acting United States Attorney
District of Arizona

*s/Peter S. Kozinets*
KEVIN M. RAPP
MARGARET PERLMETER
PETER S. KOZINETS
ANDREW C. STONE
Assistant U.S. Attorneys

DAN G. BOYLE
Special Assistant U.S. Attorney

KENNETH POLITE
Assistant Attorney General
U.S. Department of Justice
Criminal Division, U.S. Department of Justice

REGINALD E. JONES
Senior Trial Attorney
U.S. Department of Justice, Criminal Division

## **CERTIFICATE OF SERVICE**

I hereby certify that on this same date, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants who have entered their appearance as counsel of record.

*s/ Marjorie Dieckman*
U.S. Attorney's Office